N.P., a minor,
by EDDIE PERILLO,
his natural guardian,

      Plaintiff,

      v.                           **CASE NO. 3:18cv453-MCR-HTC**

THE SCHOOL BOARD OF
OKALOOSA COUNTY, FLORIDA;
LARRY ASHLEY, IN HIS OFFICIAL
CAPACITY AS SHERIFF OF OKALOOSA
COUNTY, FLORIDA; MARY BETH
JACKSON; STACIE SMITH; ARDEN
FARLEY; ANGELYN VAUGHAN;
JOAN PICKARD; MELODY SOMMER;
MARLYNN STILLIONS; DWAYNE
VASILOFF; and DOES 1-30,

      Defendants.
_____/

## ORDER

Plaintiff N.R. is an autistic, nonverbal child, who allegedly suffered physical

and verbal abuse at the hands of his special education teacher, Marlynn Stillions,

while he was enrolled at Kenwood Elementary School in Okaloosa County, Florida

during the 2014-15 and 2015-16 school years.  N.R., through his father, Eddie

Perillo, filed the instant action against the Okaloosa County School Board, the

Sheriff of Okaloosa County in his official capacity, and eight individual defendants,

alleging federal constitutional and statutory claims, as well as claims under Florida law.[1] All defendants except Stillions have moved for dismissal of N.P.'s claims.[2] Having carefully considered the law, the complaint, and the parties' arguments, the Court rules as follows.

## I. Background

The basic facts, as alleged in the Second Amended Complaint, ECF No. 135, and construed in favor of N.P., are as follows.[3]

### A. The Parties

Plaintiff N.P. is an autistic, nonverbal child enrolled in the exceptional students education ("ESE") program at Kenwood in Fort Walton Beach, Florida. Kenwood is a public school in the Okaloosa County School District ("the School District"), governed and overseen by Defendant Okaloosa County School Board

---

[1] There are three additional, related suits also pending in this Court—based on the alleged abuse of other students by an ESE teacher, Roy Frazier, and Silver Sands School, also within the Okaloosa County School District. *See C.H. v. School Bd. of Okaloosa Cty., Fla.*, Case No. 3:18cv2128-MCR/HTC (N.D. Fla.); *N.R. v. School Bd. of Okaloosa Cty., Fla.*, 3:18cv2208-MCR/EMT (N.D. Fla.); *Van Etten v. School Bd. of Okaloosa Cty, Fla.*, 3:19cv82-MCR/CJK (N.D. Fla.).

[2] *See* ECF Nos. 88 (Angelyn Vaughan), 89 (Arden Farley), 90 (Stacie Smith), 96 (Joan Pickard), 107 (Sheriff), 109 (Dwayne Vasiloff), 111 (Mary Beth Jackson), 112 (School Board), 114 (Sommer).

[3] At the Rule 12(b)(6) stage, a district court must "accept as true the facts set forth in the complaint and draw all reasonable inferences in the plaintiff's favor." *See Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010).

("School Board").  During the time period relevant to this case, Defendant Mary

Beth Jackson was the Superintendent of the School District[4] and Defendant Stacie

Smith was the Assistant Superintendent of Human Resources.[5]  The Program

Director for the ESE Department was Melody Sommer.[6]  The School District also

employed an investigator, Defendant Arden Farley, who was responsible for, as

relevant to this case, investigating allegations of misconduct by instructional

personnel and school administrators.  Deputy Dwayne Vasiloff was employed by the

Okaloosa County Sheriff's Office as Kenwood's Resource Officer.[7] Defendant

Marlynn Stillions was a special education instructor at Kenwood during the 2014-

---

[4] As Superintendent, Jackson was the executive officer of the School Board, *see* Fla. Stat. § 1001.33, tasked with implementing and enforcing School District policies set out by the School Board, as well as supervising and disciplining employees.

[5] According to the complaint, Smith's responsibilities as HR Assistant Superintendent included advising the Superintendent and School Board on matters relating to working conditions, employee discipline, enforcing policies for interviewing and placing employees, overseeing the quality of employee investigations, enforcing personnel policies and maintaining personnel files, and ensuring the welfare and safety of all students in the School District.

[6] The complaint states that as the ESE Program Director, Sommer's responsibilities included developing policies for efficient ESE services, overseeing ESE programs for compliance, and ensuring the welfare of students.

[7] According to the complaint, Vasiloff was "empowered by the State of Florida to protect, serve and ensure the safety and welfare of all students at Kenwood, including N.P."  ECF No. 135 ¶32.  School Resource officers are authorized under Florida Statutes §1006.12, which provides: "For the protection and safety of school personnel, property, students, and visitors, each district school board and school district superintendent shall partner with law enforcement agencies or security agencies to establish or assign one or more safe-school officers at each school facility within the district, including charter schools."  Fla. Stat. § 1006.12 (2019).

15 and 2015-16 school years. Defendant Angelyn Vaughan was the principal at Kenwood until she retired after the 2015-16 school year, at which time Julie Pickard became Kenwood's principal.[8]

## B.   The Allegations of Abuse at Kenwood

In April 2014, N.P., a nonverbal three-year old child diagnosed with autism spectrum disorder, began attending the pre-kindergarten ESE program at Kenwood. During the 2014-15 and 2015-16 school years, when N.P. was four and five years old, he was assigned to Stillions's special education classroom. During those years, unnamed school employees observed N.P. and other nonverbal students suffer numerous abuses by Stillions. For example, as "disciplinary tactics," Stillions forced vinegar into N.P.'s mouth and sprayed it in his face, or instructed teacher's assistants to do so; kneed him in the head and body to force him to sit down; angrily screamed and yelled at him and other ESE nonverbal students; and, for "not behaving" or "for the sole purpose of provoking and upsetting" them, Stillions would deprive N.P. and other ESE students of their lunch or portions of their breakfast. According to the Second Amended Complaint, Stillions would purposefully trip N.P. as he entered

---

[8] According to the complaint, the principal is responsible for administration of the school, enforcing policies and procedures to ensure a safe learning environment and the protection of students as well as facilitating adherence to all applicable laws, procedures, and professional ethical standards and hiring, firing, and evaluating employees.

the cafeteria and, at times, restrained him by the waistband and shirt, carried him into the cafeteria, and threw him on the floor. It is alleged that on numerous occasions, N.P. was observed lying on the floor of the cafeteria visibly upset or crying as Stillions used her foot to push or kick him down one of the aisles. In addition, Stillions secluded nonverbal ESE students, including N.P., in a basket, where she would place a bean bag on or near the child's genitals and step on it to cause the child pain.[9] Also on numerous occasions, Stillions grabbed and pinched N.P.'s face and body, causing red marks and bruises. On at least one occasion, Stillions allegedly told another employee that grabbing and pinching students was how she relieved her own stress. It is alleged that Stillions targeted N.P. and other nonverbal students because of their vulnerable status and inability to speak out or complain. N.P. is alleged to have suffered physical pain from abuse, evidenced by red marks and bruises on his skin, as well as emotional pain, including post-traumatic stress disorder, all of which has resulted in medical expenses.

According to the complaint, the abuse was "rampant and widespread" and "consistent" over a two-year period and many unnamed School District employees observed Stillions inflicting abuse on N.P. and others. It is alleged generally that all

---

[9] Stillions also violently shoved another nonverbal disabled ESE student to the ground, causing injury. Stillions falsely reported that the student had attacked her.

of the defendants were on notice of Stillions's conduct but failed to intervene or otherwise properly report the abuse.[10]  Specifically, Kenwood Principal Vaughan was told in August 2014 by one employee that another Kenwood employee had observed Stillions spraying a student in the face with a squirt bottle, yet Vaughan took no action in response.  In February 2016, a Kenwood employee reported to Principal Vaughan that Stillions had grabbed N.P. by the waist band and collar of his shirt.  Again, nothing was done.  A month later, in March 2016, a Kenwood employee reported to Vaughan that N.P. had red marks on his face from Stillions pinching him.  Principal Vaughan took no action to investigate or intervene until April 26, 2016, when she sent an email to the School District's Human Resources Department describing "Code of Ethics violations" reported by several School District employees "who had seen Stillions acting abusively to nonverbal, disabled ESE students at Kenwood."  ECF No. 135 ¶ 102.  Farley commenced an investigation into Stillions's conduct the next day, April 27.  As discussed further below, by late February 2016, HR Assistant Superintendent Smith and

---

[10] All of the individual defendants in this case were mandatory reporters under Florida law, which requires that any "[s]chool teacher or other school official or personnel" who "knows, or has reasonable cause to suspect, that a child is [being] abused . . . *shall* report such knowledge or suspicion to" the Central Abuse Hotline for the Florida Department of Children and Families.  *See* Fla. Stat. § 39.201(1), (2) (emphasis added).  "[K]nowingly and willfully fail[ing] to comply" with the mandatory reporter statute, or "knowingly and willfully prevent[ing] another person from doing so," is a third-degree felony.  *See* Fla. Stat. § 39.205(1).

Superintendent Jackson were already on notice of similar abuse at a different school within the School District, Silver Sands, where another ESE teacher was also abusing nonverbal disabled ESE students. It is alleged that the School Board, as well as Jackson, Smith, and Farley were notified about Stillions's abuse "shortly after" being made aware of the abuse at Silver Sands.

As part of Farley's investigation of Stillions, he interviewed approximately 20 School District employees. Those interviewed expressed grave concerns about Stillions's behavior and recounted the history of her abuse of ESE students, including N.P., dating back to the 2014-15 school year. During the investigation, Farley and unnamed School District administrators told employees they were not to discuss the investigation or their knowledge of Stillions's conduct, which was allegedly intended to intimidate Kenwood employees and to further conceal the multi-year pattern of abuse. It is also alleged that school officials, namely Superintendent Jackson, HR Assistant Superintendent Smith, Principal Julie Pickard, and ESE Director Melody Sommer were aware of Farley's investigation. On June 17, 2017, Farley presented an Investigative Summary Report to Smith and Pickard, which outlined the details and findings of his investigation, including multiple confirmed allegations of child abuse of N.P. Although Farley recommended some disciplinary measures against Stillions, he did not make a

mandatory report to the Florida Department of Children and Families ("DCF") Abuse Hotline as required by law, and neither did Smith or Pickard.

Kenwood Resource Officer, Deputy Vasiloff, was also allegedly on notice of Stillions's widespread abuse of ESE students, including N.P., and failed to intervene or report the abusive conduct.[11] N.P. alleges that investigators from the DCF "approached" Vasiloff sometime between 2015 (N.P.'s second year in Stillions's classroom) and 2017 regarding alleged child abuse of ESE students. Also, although DCF was called at least 50 times for investigative visits to Kenwood regarding student abuse from 2015-2017, Vasiloff intentionally refused to conduct the required law enforcement investigations and, in the vast majority of cases, did not generate any report regarding the allegations of abuse.[12]

On July 18, 2016, one month after Farley's report on Stillions, HR Assistant Superintendent Smith sent an email to Superintendent Jackson, Investigator Farley, and Principal Pickard acknowledging the School District's failure "to emphasize

---

[11] There is no allegation that he personally observed any abuse.

[12] The Second Amended Complaint does not allege who called DCF regarding abuse at Kenwood during those years or whether the calls involved N.P., but it is alleged that none of the named defendants reported Stillions's abuse. It is alleged that on at least one occasion, after reviewing a DCF intake report containing allegations of child abuse against a disabled student at Kenwood, Vasiloff's reaction was to accuse the victim of being a "little liar." ECF No. 135, at 37 ¶120. On June 28, 2017, the Sheriff's Office issued a disciplinary notification to Vasiloff, finding that he failed to adhere to policy by grossly neglecting his duties to participate in joint child abuse investigations at Kenwood and for wanton indifference towards the investigations. *Id.* ¶121.

and/or enforce the mandatory requirement to report child abuse" and requesting that, in light of the "Stillions events," child abuse/neglect training be provided to employees during the 2016-17 school year. ECF No. 135 at ¶109. The next day, Pickard sent a reply email to the same officials expressing that the employees' failure to report was a result of their not knowing "what/when" to report and fearing retaliation by a teacher's union if they reported abuse. *See id*. Two weeks later, on August 1, 2016, Smith "dismissed the case" against Stillions as untimely and decided not to include Farley's report in Stillions's personnel records. The School Board, Jackson, Smith, Farley and Sommer then approved Stillions for a transfer to Silver Sands for the following 2016-17 school year, where she was placed in another ESE classroom with even more severely disabled students.

Throughout the relevant time period in this case, none of the School District officials reported Stillions's abuse to the students' parents or to appropriate authorities, despite their state-mandated reporting obligation. N.P. alleges that this was all part of a "long-standing custom, policy, and/or practice" within the School District of deliberate indifference and concealment of abuse of ESE students.[13]

---

[13] Perillo did not learn of the investigation and abuse until, during a casual conversation in early May 2017, a Kenwood instructor expressed distaste for Stillions in light of the findings in the investigation report. Perillo then requested Stillion's personnel file and the report but was told by Superintendent Jackson's office that the documents were not available. Perillo finally received a redacted copy of the investigation report a few weeks later. His receipt of the report sparked

### C.    The Allegations of Abuse at Silver Sands

By February 2016, even before being notified of Stillions's abusive conduct, School District officials Jackson, Smith, and Farley were aware of abusive conduct towards ESE students at Silver Sands.  Roy Frazier, an ESE instructor at Silver Sands, and one teacher's aide, subjected nonverbal ESE students in Frazier's classroom to persistent physical and verbal abuse, restraint, and seclusion tactics. Frazier reportedly "pushed, slapped, punched, and kicked" ESE students entrusted to his care with great force, made students cry by pinching and flicking them, and restrained students against their will for hours, strapping them into a stationary exercise bike, confining them to cardboard boxes, and placing them in a small, dark room.  He told an aide that he was using behavioral techniques intended to redirect the students' attention by inflicting pain on them.  He also would take ESE students on "field trips," which were nothing more than opportunities for him to shop at garage sales while leaving the students locked in a hot transport van.  According to the complaint, Teacher's aides repeatedly reported this conduct to the principal of

---

publicity as well as numerous DCF and criminal investigations about the abuse.  As a result, Farley, Smith, Vaughan, and Stillions were arrested. The Court takes judicial notice of public records showing that Stillions was convicted in state court on three counts of child abuse and sentenced to seven years in prison for abusing N.P., and Farley, Smith, and Vaughan were each convicted on counts of failure to report suspected child abuse.

Silver Sands, Farley, Jackson, and Smith over a two year period, yet no action was taken until early 2016, when Farley conducted an investigation into the reports of abuse by Frazier.[14]  An administrative assistant at Silver Sands acknowledged that employees were instructed by School District administration to report abuse allegations only to the principal for the purpose of concealing the abuse and intentionally circumventing the mandatory reporting requirements of Florida law.

On February 24, 2016, Farley submitted his investigative report to the Human Resources Division where Smith was the HR Assistant Superintendent, confirming seven out of seven abuse allegations, which he characterized as "ethical violations," including wrongful physical contact with ESE students.  On March 5, 2016, Farley sent a summary of the investigation to Smith and Jackson.  On March 16, 2016, Smith then sent Jackson a letter recommending that Frazier receive a 3-day paid suspension for "not following student [behavioral intervention plans]" and "not documenting accurate travel locations when he took students on field trips."  ECF 135, ¶94.  The next day, Superintendent Jackson recommended the paid suspension to the School Board.  It is alleged that Jackson and Smith "intentionally concealed"

---

[14] The Silver Sands principal allegedly told one aide who complained of Frazier's conduct not to report the abuse to avoid ruining his (the principal's) upcoming retirement.

CASE NO. 3:18cv453-MCR-HTC

the confirmed physical abuse of nonverbal disabled ESE students by Frazier.[15]  *Id.*

It is also alleged that Frazier remained in the classroom through the end of the school

year and when asked, prior to the end of the school year, why Frazier had been left

in the classroom with the same nonverbal students, Jackson and Smith did nothing.

It is further alleged that School District administrators retaliated against aides who

complained of or reported the abuse, moving them to different classrooms or

changing their lunch hour to prevent them from being present with Frazier and

witnessing further abuse.   Jackson, Smith, and Farley each failed to make a

mandatory report of the abuse to the DCF.[16]  N.P. alleges that this was all part of a

"longstanding custom, policy, and/or practice" within the School District of

deliberate indifference to, and concealment of, abuse of ESE students.

## C.    Procedural Posture

In the Second Amended Complaint, N.P. alleges constitutional claims of

unlawful restraint, substantive due process, equal protection, and conspiracy to

interfere with N.P.'s civil rights on theories of individual and supervisory liability

---

[15] It is unclear from ¶94 of the Second Amended Complaint whether the abuse was concealed from School Board members.

[16] N.P. alleges that on one occasion during the 2015-16 school year, school administrators even made a false report of child abuse to DCF, naming the wrong child, purportedly as an attempt to conceal abuse by Frazier.

CASE NO. 3:18cv453-MCR-HTC

and a custom of deliberate indifference and concealment (Counts One through Ten). He also asserts federal law claims against the School Board under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.,* and Section 504 of the Rehabilitation Act, 29 U.S.C. § 701, *et seq.* (Counts Eleven and Twelve), as well as various state law claims against Stillions for negligence and battery (Counts Eighteen and Twenty[17]), and state law claims against the School Board and the Okaloosa County Sheriff for negligent hiring, training, and supervision, and *respondeat superior* (Counts Fourteen through Seventeen). In response, nine of the ten defendants moved to dismiss for failure to state a claim, raising issues of governmental and qualified immunity, exhaustion of administrative remedies, and the intracorporate conspiracy doctrine.[18]

## II. Legal Standard

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a complaint. Federal pleading rules require a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." See Fed. R. Civ. P. 8(a)(2). While detailed allegations are not required, there must be "more

---

[17] The Second Amended Complaint does not include a Count Nineteen.

[18] Although the motions were filed in response to the First Amended Complaint, the Court will consider them as responsive to the Second Amended Complaint, which was filed only to reveal the name of N.P.'s guardian after the Court denied his attempt to proceed pseudonymously.

than labels and legal conclusions, and a formulaic recitation of the elements of a cause of action" will not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, the factual allegations in a complaint must state a claim that is "plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and which "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555.

In deciding whether a plaintiff has set forth a plausible claim, the court must accept the factual allegations in the complaint as true, *Erickson v. Pardus*, 551 U.S. 889, 94 (2007), and draw all reasonable inferences in the plaintiff's favor, *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010). However, "[l]egal conclusions without adequate factual support are entitled to no assumption of truth." *Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011). The plausibility determination presents a "context-specific task" that requires a court to draw on judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Dismissal is appropriate only where, "on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Glover v. Liggett Group, Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (quoting *Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993)).

## III.  Discussion

The Court begins with N.P.'s constitutional claims against the individual defendants under supervisory liability, including whether any of them are entitled to qualified immunity.  The Court then addresses N.P.'s constitutional and federal law claims against the School Board, followed by the constitutional conspiracy claims, and state law claims against the School Board and Sheriff.

### A.    Individual Defendants, Constitutional Claims

In Counts Five, Six, and Seven, N.P. alleges violations of his substantive due process and equal protection rights under 42 U.S.C. § 1983 (providing a cause of action for the deprivation of a constitutional or federal statutory right by a state actor).[19]  More specifically, N.P. argues that Superintendent Jackson, HR Assistant Superintendent Smith, Investigator Farley, Principal Vaughan, Principal Pickard, ESE Program Director Sommer, and Deputy Vasiloff are liable as supervisors because they had notice of Stillions's abusive conduct, failed to adequately respond, cultivated a culture and atmosphere of intimidation in the School District that

---

[19] The equal protection claims purport to be brought under § 1983 but, in addition to the federal Constitution, include a reference to the Florida Constitution.  The alleged violations of a state constitution are not cognizable under § 1983, and thus the reference to the Florida Constitution will be stricken from Count Three (against the School Board) and Count Seven (against the individual defendants).

CASE NO. 3:18cv453-MCR-HTC

precluded reports or instructed others not to report, and established and implemented policies that allowed a custom of deliberate indifference, which in turn caused continued abuse in violation of N.P.'s substantive due process rights.[20] In addition, it is alleged that the defendants targeted N.P. for different treatment by their deliberate indifference because he was a nonverbal disabled ESE student, in violation of his right to equal protection.[21]

In this case, it is undisputed that all of the individual defendants were acting under color of state law in regard to the conduct alleged by N.P.: they acted in their capacities as a deputy, program director, principal, investigator, assistant

---

[20] For purposes of the substantive due process claim, the Eleventh Circuit has held that "excessive corporal punishment, at least where not administered in conformity with a valid school policy authorizing corporal punishment as in *Ingraham*, may be actionable under the Due Process Clause when it is tantamount to arbitrary, egregious, and conscience-shocking behavior" that is "unjustifiable by any government interest." *Neal ex rel. Neal v. Fulton Cty. Bd. of Educ.,* 229 F.3d 1069, 1075 (11th Cir. 2000) (citing *Ingraham v. Wright,* 430 U.S. 651, 675 (1977)). There is no argument that Stillions's conduct failed to meet this standard.

[21] Generally, equal protection violations arise when the state classifies and treats "some discrete and identifiable group of citizens differently from other groups." *See Corey Airport Serves., Inc. v. Clear Channel Outdoor, Inc*., 682 F.3d 1293, 1296 (11th Cir. 2012). To state an equal protection claim, the plaintiff must therefore show that the state treated him differently than other similarly situated persons based on his or her membership in an identifiable group or class of persons. *See id.; see also Leib v. Hillsborough Cty. Pub. Transp. Comm'n,* 558 F.3d 1301, 1305 (11th Cir. 2009). Notably, persons with a disability can be an identifiable group, *see City of Cleburne, Tex. v. Cleburne Living Ctr*., 473 U.S. 432, 446 (1985), and "proof of discriminatory intent or purpose is a necessary prerequisite to any Equal Protection Clause claim." *Corey,* 682 F.3d at 1297 (citing *Parks v. City of Warner Robins,* 43 F.3d 609, 616 (11th Cir. 1995)). Again, the defendants do not assert that Stillions did not target the nonverbal, disabled children for abuse.

superintendent, or superintendent of a public school district. Because it is not alleged that these defendants participated in the physical abuse of N.P., the only issue is whether N.P. has adequately alleged that these defendants deprived him of his constitutional rights while acting as Stillions's supervisors.

Supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability. *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010). However, they may be liable for their own misconduct. *Iqbal*, 556 U.S. at 676-77. Actionable misconduct occurs where the supervisor "personally participate[d] in the alleged constitutional violation" or where "there is a causal connection between actions of the supervising official and the alleged constitutional violation." *See id*. The causal connection can be established in several ways. First, a plaintiff can show that a "history of widespread abuse"—one that was "obvious, flagrant, rampant and of continued duration"—put a "responsible supervisor" on notice of the need to correct the alleged constitutional deprivations, but he failed to do so. *Doe v. Sch. Bd. of Broward Cty., Fla.,* 604 F.3d 1248, 1266 (11th Cir. 2010). Importantly, "[t]here is no bright line identifying when misconduct transforms from a couple of isolated instances into a pattern of abuse." *Williams v. Fulton Cty. Sch. Dist.*, 181 F. Supp. 3d 1089, 1128 (N.D. Ga. 2016) (citing *Broward Cty.*, 604 F.3d at 1266). "One or

CASE NO. 3:18cv453-MCR-HTC

two incidents of abuse is generally insufficient to indicate a pattern." *Id*.; *see also Broward Cty.*, 604 F.3d at 1266. However, allegations of anything more than that are generally found sufficient at the motion to dismiss stage, even if the abusive acts were committed by a single employee. *See Williams*, 181 F. Supp. 3d at 1122; *see also Valdes v. Crosby*, 450 F.3d 1231, 1244 (11th Cir. 2006) (13 complaints of prisoner abuse over 1.5 year period); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 456-57 (5th Cir. 1994) (five prior incidents of sexually inappropriate behavior by teacher); *Shaw v. Stroud*, 13 F.3d 791, 800 (4th Cir. 1994) (finding knowledge of at least three prior incidents of excessive force was sufficient to be widespread); *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 728-29 (3d Cir. 1989) (five complaints of abuse by two teachers over 4 years found sufficient); *J.V.*, 2005 WL 1243756, at \*3 (repeated acts of abuse by a single teacher). Alternatively, the plaintiff can establish causation with facts supporting "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Keating*, 598 F.3d at 762. Finally, the causal connection can be established where the supervisor's "improper custom or policy results in deliberate indifference to constitutional rights." *See Broward Cty.*, 604 F.3d at 1266. In other words, the requisite causal connection for establishing supervisory liability is shown where the "responsible

supervisor" is on notice of widespread abuse and the need to correct the deprivation but fails to do so. *See Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).

### 1.    Jackson, Smith, Vaughan, and Farley

As an initial matter, Jackson and Vaughan, as the District Superintendent and the Principal of Kenwood, respectively during the relevant time frame, were clearly supervisors, and they do not argue otherwise. Smith and Farley, however, argue that they did were not Stillions's supervisors. N.P. responds that supervisory liability is not dependent on a direct supervisor relationship, citing 29 U.S.C. § 152(11) (defining supervisor broadly to include an individual with authority to hire, transfer, discharge, or discipline "or to effectively recommend such action").

In Smith's view, the pleading conflates into one category individuals with various roles under the hierarchy created for schools in the Florida Constitution and the Florida statutes, which gives the Superintendent and the Principal supervisory authority over personnel.[22] On consideration, the Court is not prepared to find, as a matter of law or fact, that Smith was a supervisor. There is no express allegation

---

[22] *See* Fla. Const. Art. IX §§ 4-5 (establishing school boards and superintendents); *see also* Fla. Stat. §§ 1001.32 (school board, superintendent, and principal as supervisors); 1001.33 (superintendent as executive officer of school board); 1001.41 (general powers of school board); 1001.49 (superintendent has authority for general oversight and to advise school board); 1001.54 (principal has authority over school district personnel); 1012.27-.28 (stating duties of superintendent and principal over personnel).

that she was Stillions's supervisor and no allegation that she had oversight over Stillions's classroom conduct. Nonetheless, drawing all inferences N.P.'s favor, given Smith's title of Assistant Superintendent and her role in advising the Superintendent with regard to disciplinary matters, together with the allegation that she dismissed the disciplinary case against Stillions and participated in the decision to transfer her to Silver Sands, the Court finds that it is plausible on these allegations to infer that Smith had a supervisory role. Whether that inference will be justified on a fully developed record is a question for another day.[23]

However, no such plausible inference arises from the allegations about Farley's role as Investigator. Although Investigator Farley is alleged to have had responsibility for "establishing, implementing and/or enforcing policies and procedures regarding the training and/or supervision of employees," *see* ECF No. 135, ¶22, and he recommended disciplinary measures for Frazier in his report, there is no allegation that Farley was a part of the School District chain of command or a "responsible supervisor" with respect to Stillions. Indeed, the facts related to Farley plausibly show only that he was tasked with investigating the complaints, and then passed his reports and recommendations to his supervisors, who essentially ignored

---

[23] The parties are advised that this issue will have to be supported by facts and adequately briefed in order to survive summary judgment.

his substantiated findings of physical abuse and recommended disciplinary actions against Stillions. There is no factual allegation showing that Farley had authority to remove Stillions from the classroom, or otherwise effectuate that result. In short, N.P. has offered no factual or legal support for the proposition that an investigator for a school district, like Farley, can be deemed a supervisor of the school district's employees.[24] Consequently, Counts Five, Six, and Seven fail to state a claim against Farley.

Turning to the substance of the § 1983 claims, Jackson, Smith, and Vaughan argue that the Second Amended Complaint fails to show a constitutional violation for purposes of supervisory liability. Each argues that she did not participate in the underlying abuse, but, as already noted, their personal participation in the abuse is neither alleged nor is it required for supervisory liability. Notably, they do not argue that *Stillions's* underlying conduct did not amount to a substantive due process violation. Thus, the defendants' liability for a substantive due process violation as supervisors will turn on their knowledge of, and conduct in response to, that violation.

---

[24] The fact that Investigator Farley was a mandatory reporter does not make him a supervisor for purposes of § 1983. As already discussed, in Florida, *all* school teachers and "other school official[s] or personnel" are mandatory reporters. *See* Fla. Stat. § 39.201(1)(d)(1).

CASE NO. 3:18cv453-MCR-HTC

Regarding notice and causation, Jackson, Smith, and Vaughan, argue that the allegations of the Second Amended Complaint amount to nothing more than mere labels and conclusions. While it is true that some allegations are conclusory in nature, *i.e.,* that Stillions's abusive conduct was "rampant and widespread and witnessed by, and/or *reported to*" numerous School Board and School District employees or that they were "on notice" and "had knowledge of the abuse," the Court concludes that the Second Amended Complaint contains factual allegations sufficient to substantiate a plausible inference on issues of notice and causation as to these defendants. Jackson and Smith argue that the complaint does not plausibly show they were aware of widespread abuse at *Kenwood* prior to the end of the school year, but this argument too narrowly confines the issue to Stillions's conduct alone and does not accurately reflect the allegations as a whole. N.P. alleges District-wide abuse beginning with the complaints against Frazier. It is sufficiently alleged that Jackson and Smith were aware of Frazier's multi-year abuse of many ESE students at Silver Sands by at least February 2016 or early March 2016, when Farley completed his investigation of Frazier and confirmed the abuse. "Shortly after" learning of Frazier's abuse, Jackson and Smith were allegedly made aware of the complaints of abuse by Stillions, ECF No. 135, ¶¶ 104, 101, which also included multiple incidents of abuse over a two-year period. The allegations are clear that

Jackson and Smith knew of the complaints against Stillions at least by the start of Farley's investigation into her conduct on April 27, 2016.

The complaint also alleges that Jackson and Smith inextricably took no action to remove either Frazier or Stillions from the classroom or adequately discipline them. Thus, it is plausibly alleged that, because Frazier's and Stillions's conduct impacted many ESE students at two different schools, Jackson and Smith were aware of widespread abuse before the end of the 2015-16 school year and the need to remove these teachers and implement corrective policies in the School District. *See Williams*, 181 F. Supp. 3d at 1122 (observing that "anything more than" one or two incidents of abuse is "generally sufficient" to "indicate a pattern" at the motion to dismiss stage). Their inaction and concealment of the abuse in several instances plausibly establishes a causal connection between the action and inaction of Jackson and Smith and the alleged constitutional violations of Frazier and Stillions, causing N.P. to continue suffering abuse through the end of the 2015-16 school year.[25]

Principal Vaughan argues that the three single complaints she received about Stillions's abuse, one as early as August 2014, were insufficient to put her on notice

---

[25] According to the complaint, even after the end of the school year, indifference and concealment continued. Smith "dismissed the case against Stillions," ECF No. 135 at ¶113, and did not include the report in Stillions's personnel file. Jackson and Smith transferred Stillions to Silver Sands, a school with even more severely disabled ESE students.

of a pattern of ongoing constitutional injury. The Court disagrees. Vaughan received and ignored a complaint about Stillions in August 2014, when it was reported that Stillions used a spray bottle to spray ESE students in the face. Vaughan ignored a second report in February 2016 of Stillions having grabbed N.P. by the waist band and collar, and in March 2016, Vaughan received a third report of Stillions causing red marks on N.P.'s face. Even then, no immediate action was taken. Vaughan finally took action at the end of April, and an investigation was initiated. However, she made no report of abuse to DHS and did not remove Stillions from the classroom or otherwise protect N.P. from further abuse through the end of the school year. Giving N.P.'s allegations every reasonable inference, as the Court must at this stage, they plausibly suggest Vaughan was on notice of a pattern of abuse by Stillions as of March 2016 (the third complaint to her), and that she responded to each complaint with indifference and inaction that could rise to a constitutional violation, especially in light of N.P.'s vulnerable status as a very young nonverbal, disabled child.

On the supervisory equal protection claim, it is necessary for N.P. to allege facts showing that the supervisory defendants acted with discriminatory intent or purpose, which, as noted above, requires a showing that the supervisory defendants' discriminatory actions or omissions were taken "because of, not merely in spite of, the action's adverse effect upon an identifiable group." *See Iqbal*, 556 U.S. at 676-

77. Discriminatory intent on the part of Jackson, Smith, and Vaughan is properly inferred from the allegations of the complaint. N.P. alleges that he and other nonverbal, disabled students were intentionally treated differently than verbal, disabled students and/or nondisabled students because of their disabilities and inability to speak out. N.P. also alleges that Stillions targeted and abused nonverbal, disabled students, "because she knew they were vulnerable, defenseless children and she knew they were unable to report the abuse, advocate for themselves, or otherwise confront her for such conduct." ECF No. 135, ¶66. He further alleges that Jackson, Smith, and Vaughan were deliberately indifferent to the rights of the nonverbal, disabled ESE students, including N.P., because of their disability. The supervisory defendants concealed, failed to stop, and failed to adequately address the abuse of nonverbal, disabled students because of their profound disability and inability to speak out against the abuse.[26] At this early stage of the proceedings, the Court finds these allegations sufficient to permit an inference of discrimination as to against Jackson, Smith, and Vaughan. *See Williams*, 181 F. Supp. 3d at 1137-38 (finding plaintiff stated a plausible equal protection claim against school principal where he alleged that abuse of nonverbal, disabled students was concealed or ignored while

---

[26] The supervisory defendants' alleged inaction, inadequate responses to, and concealment of the abuse of N.P. and other nonverbal ESE students is detailed elsewhere in this Order.

other verbal, disabled and nondisabled students were "not subject to the same abusive treatment . . . and reports of their abuse were not ignored"); *see also T.E. v. Grindle,* 599 F.3d 583, 588-89 (7th Cir. 2010)) (determining that a jury could reasonably infer that the principal acted with intent to discriminate on the basis of gender where there was evidence that she covered up and attempted to downplay the sexual abuse of female students); *cf. Hill v. Cundiff,* 797 F.3d 948, 978 (11th Cir. 2015) (holding that a school principal can violate a female student's rights under Equal Protection Clause when he does nothing in response to known sexual harassment and such inaction amounts to deliberate indifference).

At this point, the Court finds it important to emphasize that the above determinations do not amount to a final conclusion that the alleged conduct of any of the supervisory defendants—Principal Vaughan, HR Assistant Superintendent Smith, or Superintendent Jackson—did, as a matter of fact or law, violate N.P.'s substantive due process or equal protection rights. Indeed, there are many "good faith but ineffective responses that might satisfy a school official's [constitutional] obligation[s]" with respect to allegations that a teacher is physically abusing students, *see Taylor*, 15 F.3d at 456 n.12, and discriminatory intent is also highly fact intensive. N.P. claims that the supervisory defendants' conduct knowingly and with discrimination abdicated their duty to protect him, which, in turn, resulted in

constitutional injury. Whether N.P. ultimately will be able to establish the requisite

knowledge and "blind eye" acquiescence in Stillions's alleged abuse is unknowable

at this stage. However, given the flexible notice pleading standard[27] and the detailed

allegations of abuse, and the knowledge, intent, and roles of the supervisory

defendants, together with their alleged failure to report or take corrective action, the

Court finds the complaint sufficient to merit the development of an evidentiary

record to permit full consideration of all relevant facts before a final conclusion is

reached.[28] [29] *See Cottone,* 326 F.3d at 1360 (stating the "causal connection can be

---

[27] Although the defendants correctly note that "[t]he standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous," *Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1266 (11th Cir. 2010), this is the pleading stage, and no heightened pleading standard applies. *See Randall*, 610 F.3d at 709-10 (applying the *Iqbal* pleading standard to § 1983 pleadings).

[28] The only allegation of continuing harm to N.P. is that the abuse was "consistent" throughout the school year, which is barely adequate even for purposes of pleading. Plaintiff is cautioned that more will be needed to create a genuine issue of fact on causation and injury in order to survive summary judgment, but at this stage, it is appropriate to view the pleading as a whole and draw the plausible inference in his favor that the same consistent abuse he endured for nearly two years continued while Stillions was present in the classroom with him.

[29] For the same reasons, N.P.'s request for punitive damages against the supervisory defendants on the federal claims is not subject to dismissal. The complaint alleges that these defendants behaved with deliberate indifference to N.P.'s safety and sets forth plausible facts to support that allegation. Therefore, the complaint suffices to state a claim for punitive damages. *See, e.g., Riley v. Camp*, 130 F.3d 958, 980 (11th Cir. 1997) (affirming award of punitive damages in deliberate indifference case); *H.C. by Hewett v. Jarrard*, 786 F.2d 1080 (11th Cir. 1986) (reversing district court's denial of punitive damages in § 1983 claim involving denial of medical care to juvenile inmate); Gibson v. Moskowitz, 523 F.3d 657 (6th Cir. 2008) (allowing recovery of $3 million in punitive damages when inmate died as result of jail psychiatrist's deliberate indifference to medical needs).

established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and [s]he fails to do so").

### 2. Pickard and Sommer

Pickard became Kenwood's principal "following the 2015-2016 school year," which was after Principal Vaughan retired. ECF No. 135 ¶25. There is no plausible allegation that her actions, inaction, or concealment of Stillions's abuse—which could only have been based on her knowledge and actions as a supervisor after the fact, in the summer of 2016—caused any constitutional injury to N.P. before the end of the 2015-16 school year. Although there are allegations that Pickard failed to report and actively participated in a subsequent cover-up, any factual allegations that Pickard was on notice of continuing, ongoing abuse are too conclusory and in fact are contrary to the allegation that she became principal *following* the 2015-16 school year.

There also is no plausible factual allegation that Sommer, the program director for the ESE program, had knowledge of widespread abuse and acted with indifference causing injury to N.P. She is alleged to have participated in transferring Stillions to Silver Sands, but no injury is alleged after that time. The only allegation involving Sommer before the end of the school year that could establish a causal connection to harm to N.P. is that she knew of Farley's investigation of Stillions and

made no report to DCF. Without more, these bare allegations are insufficient to provide a basis for inferring she was on notice of widespread abuse and was deliberately indifferent. Consequently, the Second Amended Complaint fails to state a claim of supervisory liability against Pickard or Sommer in Counts Five, Six, and Seven.

### 3. Vasiloff

Deputy Vasiloff was employed by the Okaloosa County Sheriff's Office as Kenwood's Resource Officer. He was not employed by the School District. N.P. concedes there is no assertion that Vasiloff personally participated in the abuse and thus is relying on Vasiloff's actions and omissions for supervisory liability. Without citation to law, N.P. states it is "common sense" that Vasiloff was acting in a supervisory role and asserts that the issue of whether he was a supervisor is factual in nature and should not be resolved at the motion to dismiss stage. Although there are allegations that Vasiloff was empowered to protect the safety of children and, in a conclusory manner, that he was aware of ongoing abuse of ESE students at Kenwood and failed to report it or to participate in investigations when approached by DCF at some point during the 2015-16 school year, there are no factual allegations within ¶¶ 31-32 (cited by N.P.) or any other paragraphs of the Second Amended Complaint that plausibly show that Vasiloff held a supervisory position

over teachers at the school, let alone Stillions. Therefore, Counts Five, Six, and Seven fail to state a claim of supervisory liability against Vasiloff.

### 4. Qualified Immunity

All defendants argue they are entitled to qualified immunity with respect to N.P's constitutional claims. A complaint is subject to dismissal under Rule 12(b)(6) where its allegations, on their face, show that an affirmative defense bars recovery on the claim. *Cottone*, 326 F.3d at 1357. "In reviewing a motion to dismiss based on qualified immunity, [a] district court is required to accept the factual allegations in the plaintiff's complaint as true and draw all reasonable inferences in favor of the plaintiff." *Epps v. Watson*, 492 F.3d 1240, 1242 n.1 (11th Cir. 2007) (quoting *Wilson v. Strong*, 156 F.3d 1131, 1133 (11th Cir 1998)).

The affirmative defense of qualified immunity shields public officials performing discretionary functions from suit in their individual capacities, unless their conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To receive the benefit of qualified immunity, an official must first show that he was acting within his discretionary authority when the allegedly unlawful acts occurred. *See Cottone*, 326 F.3d at 1357. Once this showing is made, the burden shifts to the

plaintiff to show that the official is not entitled to qualified immunity.  *Id*. at 1358.

An official is not entitled to qualified immunity where: (1) his alleged conduct

violated a federal statutory or constitutional right; and (2) the right was clearly

established at the time of the violation.  *Id*. at 1358-59.  A right is "clearly

established" if "it would be clear to a reasonable [public official] that his conduct

was unlawful in the situation he confronted."  *Id*. at 1359.  In other words, the state

of the law must have provided the official with "fair warning that [his] alleged

[conduct] was unconstitutional."  *Id*.

In this case, it cannot be reasonably disputed that the acts forming the basis of

N.P.'s § 1983 claims are discretionary in nature.[30]  Moreover, the Court has already

found that the allegations in the operative complaint, taken as true, do not state a

plausible constitutional claim for supervisory liability against Farley, Pickard,

---

[30] According to N.P., the defendants' failure to make a mandatory report of child abuse to DCF was a ministerial, as opposed to discretionary, function.  This argument lacks merit.  It cannot be reasonably disputed that the acts forming the basis of N.P.'s § 1983 claims against these defendants—deliberate indifference or a failure to intervene in light of a teacher's ongoing physical abuse of a nonverbal ESE student—were related to their jobs and thus discretionary in nature for purposes of the qualified immunity analysis, regardless of the additional mandatory reporting required by them under state law.  *See Holloman v. Harland*, 370 F.3d 1252, 1265-66 (11th Cir. 2004) (noting discretionary function means a task within the employee's job responsibilities, even if it does not necessarily require the exercise of discretion; abandoning the "discretionary function/ministerial task dichotomy").

Sommer, and Vasiloff. Consequently, they are entitled to qualified immunity on the § 1983 claims in Counts Five, Six, and Seven.

As to Jackson, Smith, and Vaughan, the Court has found the complaint, taken as true, sufficient to state *plausible* supervisory substantive due process and equal protection claims. Thus, for purposes of qualified immunity, the Court must now consider whether reasonable school officials would have known and understood that such conduct is unconstitutional. It has long been clearly established that supervisory liability under § 1983 is imposed against supervisory officials in their individual capacities for: (1) their own culpable action or inaction in response to notice of constitutional deprivations resulting from a subordinate's "history of widespread abuse"; and (2) conduct reflecting an "improper custom or policy" of deliberate indifference to the constitutional rights of others. *Broward Cty.*, 604 F.3d at 1266; *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999); *see also Iqbal*, 556 U.S. at 676-77 (recognizing supervisory liability for equal protection violations). The right to be free from arbitrary and excessive corporal punishment in a school context is also clearly established under Supreme Court and Eleventh Circuit precedent, *see Ingraham v. Wright,* 430 U.S. 651, 672-74 (1977); *Neal ex rel. Neal v. Fulton Cty. Bd. of Educ.,* 229 F.3d 1069, 1075 (11th Cir. 2000); *Kirkland*, 347 F.3d at 904, as is the right to be free from intentional and arbitrary disparate

treatment on account of disability, *see Cleburne*, 473 U.S. at 446. A reasonable supervisory school official would have known that the alleged multi-year history of physical abuse of nonverbal ESE students, and the abject failure of supervisory school officials to address and prevent that abuse, would result in a violation of the students' constitutional rights. The question of whether the allegations can be substantiated presents "another issue for another time." *Williams*, 181 F. Supp. 3d at 1129. For now, N.P. has pled enough facts to overcome qualified immunity as to Jackson, Smith and Vaughan on Counts Five, Six, and Seven at this stage.

### B. The School Board—Federal Claims

### 1. Constitutional Claims

Counts One, Two, and Three allege that the School Board, a municipal entity, is responsible for the violation of N.P.'s rights to be free from unreasonable seizure and the use of excessive force at the hands of Stillions,[31] as well as equal protection

---

[31] Count One is brought under the Fourth Amendment. However, claims of school abuse as purported punishment are viewed under the Fourteenth Amendment, as alleged in Count Two. *See e.g., T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cty., Fla.*, 610 F.3d 588, 612 (11th Cir. 2010) (analyzing an excessive corporal punishment claim under the Fourteenth Amendment); *Neal*, 229 F.3d at 1075 ("[E]xcessive corporal punishment may in certain circumstances state a claim under the substantive Due Process Clause" of the Fourteenth Amendment.). "While the contours of this historic liberty interest in the context of our federal system of government have not been defined precisely, they always have been thought to encompass freedom from bodily restraint and punishment." *Ingraham*, 430 U.S. at 673–74. Therefore, Count One will be dismissed. Indeed, N.P.'s theory of "unreasonable seizure" is factually and legally inseparable from his substantive due process claim in Count Two.

under the laws based on the intentional targeting of nonverbal ESE students for abuse.[32]  *See Monell v. Dep't of Social Services*, 436 U.S. 658 (1978) (discussing municipal liability).  There is no challenge to any formally adopted policy of the School Board.  Instead, it is alleged that the School Board had an unofficial custom of deliberate indifference and failure to respond to abusive conduct by teachers; failed to implement or enforce policies regarding training, supervising or disciplining employees in the reporting of child abuse and to prevent the violation of constitutional rights of students; and cultivated an atmosphere of intimidation to prevent reports of child abuse or encourage instructing employees not to report constitutional violations.  In response, the School Board argues that N.P. has failed to allege facts sufficient to support a claim for municipal liability under § 1983 and *Monell*.  The Court disagrees.

The Supreme Court "has placed strict limitations on municipal liability under § 1983."  *Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003).  A municipal entity, like the School Board in this case, cannot be held liable under

---

[32] For purposes of the motion to dismiss, the School Board does not challenge the fact that Stillions's underlying abusive conduct against N.P. rose to the level of substantive due process and equal protection violations.  Also, because the same abusive conduct is at the heart of each of these counts, the Court need not differentiate between them in for purposes of determining municipal liability.

§ 1983 "simply because its agent causes an injury, even a constitutional injury." *Gilmere v. City of Atlanta, Ga.*, 737 F.2d 894, 902 (11th Cir. 1984). Thus, a § 1983 claim against a municipality may not be premised on a theory of *respondeat superior*. *Monell*, 436 U.S. at 691. Instead, a plaintiff must identify a municipal custom or policy that caused his injuries. *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). In other words, liability may only attach where the municipality's custom or policy caused municipal employees to violate the plaintiff's constitutional rights. *Id*.

A plaintiff can establish municipal liability under *Monell* in three ways: (1) identify an official policy; (2) identify an unofficial custom or practice that is "so permanent and well settled as to constitute a custom and usage with the force of law"; or (3) identify a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights.[33] *See Cuesta v. Sch. Bd. of Miami-Dade Cty., Fla.*, 285 F.3d 962, 966, 968 (11th Cir. 2002). Only the second theory of municipal liability is alleged in this case.[34]

---

[33] The *Monell* standard and analysis applies to both the equal protection claim, *see Hill*, 797 F.3d at 977-78, and the substantive due process claim, *see Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442-43 (11th Cir. 1985), against the School Board.

[34] The School Board's brief only addresses the first and third bases for municipal liability; that is, it argues that liability under *Monell* only attaches to an "official policy or custom" or a "decision that is officially adopted by the municipality or created by an official of such rank that he or she can be said to be acting on behalf of the municipality." *See* ECF No. 112 at 7-10. As

Municipalities may be sued for "constitutional deprivations visited pursuant to governmental 'custom' even though such custom has not received formal approval through the [municipality's] official decisionmaking channels." *Monell*, 436 U.S. at 690-91. Custom consists of "persistent and widespread . . . practices" or "deeply embedded traditional ways of carrying out . . . policy" that, although unwritten, are "so permanent and well settled as to [have] . . . the force of law." *See id*. at 691 & n.56. In cases alleging municipal "inaction," a custom arises where a municipality fails to correct "the constitutionally offensive actions of its employees" and instead "tacitly authorizes" or "displays deliberate indifference towards the misconduct." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001). Importantly, the municipality must have actual or constructive knowledge of the widespread unconstitutional practice to form a custom of indifference, and "random acts or isolated incidents are insufficient." *See Depew v. City of St. Marys, Georgia*, 787 F.2d 1496, 1499 (11th Cir. 1986). To plausibly state a § 1983 claim against the School Board based on deliberate indifference to widespread abuse, N.P. must sufficiently allege: (1) the existence of a widespread and a persistent pattern of abuse by the teachers; (2) that the School Board had actual or constructive knowledge of

---

neither of these bases for municipal liability are alleged in this case, the School Board's argument against municipal liability wholly misses the mark.

the abuse; (3) that the School Board tacitly approved or deliberately ignored the abuse, such that their inaction became a custom; and (4) that the School Board's custom of inaction through deliberate indifference was a "moving force" behind the constitutional violations. *Williams*, 181 F. Supp. 3d at 1121.

In addition to the allegations of a custom of inaction in responding to reports of child abuse, the complaint asserts that the School Board is liable for its failure to train and supervise employees regarding student abuse. The School Board's liability under § 1983 for a failure to train and supervise is similarly limited to circumstances where the failure to train or supervise amounts to deliberate indifference and is based on an official policy or custom. *See City of Canton v. Harris*, 489 U.S. 378, 387 (1989). To state such a claim, N.P. must sufficiently allege that: (1) the employees were inadequately trained or supervised, (2) this failure to adequately train or supervise is the policy or custom of the government entity, and (3) the policy or custom caused the employees to violate a citizen's constitutional rights. *Id.* at 389–91; *see also Gold,* 151 F.3d at 1350. Because "a municipality will rarely have an express written or oral policy of inadequately training or supervising its employees," a policy or custom may be shown where the failure to train or supervise evidenced "deliberate indifference" to constitutional rights in the face of a "history of widespread prior abuse" or where a pattern of prior similar incidents put the

CASE NO. 3:18cv453-MCR-HTC

municipality on notice of a need to train or supervise. *Gold,* 151 F.3d at 1350-51

(quoting *City of Canton*, 489 U.S. at 388-89, and *Wright v. Sheppard*, 919 F.2d 665,

674 (11th Cir. 1990)).

The School Board argues that the allegations of notice are insufficient to

support the claim. The Court disagrees.[35] N.P.'s claims are based on allegations of

a widespread pattern of abuse by Frazier and then also Stillions, which was known

by the Superintendent Jackson and HR Assistant Superintendent Smith as of

February or early March 2016, and by the Principal of Kenwood, as early as March

2016, when she received the third report of Stillions's abusive conduct. Without

repeating the facts already detailed, the Court finds simply that the first three

elements necessary to state a claim for liability under *Monell* are satisfied based on

(1) the ongoing widespread abuse of multiple ESE students at Silver Sands and

Kenwood that occurred over a two-year period; (2) constructive knowledge to the

School Board based on Jackson, Smith, and Vaughan's knowledge of the abuse;[36]

---

[35] The School Board relies on cases decided under a heightened pleading standard, which no longer applies in this context. *See Glossip v. Gross*, 135 S. Ct. 2726, 2739 (2015) ("§ 1983 alone does not impose a heightened pleading requirement"); *Randall*, 610 F.3d at 709 (rejecting the application of a heightened pleading standard that had applied to § 1983 cases involving qualified immunity, finding the standard was inconsistent with *Iqbal*).

[36] Because the Superintendent is the executive officer of the School Board, she is a high enough official that notice to her constitutes notice to the School Board. *See* Fla. Stat. § 1001.33 (describing the superintendent as the executive officer of the school board); *Williams*, 181 F. Supp. 3d at 1123 (denying a school district's motion to dismiss § 1983 claim against it and stating that

and (3) their indifference and inaction towards the ongoing abuse at both schools, concealment of the abuse, and the obvious need for training and supervision District-wide to address the abuse. Inaction and a need for training and supervision are plausibly alleged despite the fact that the School Board investigated the complaints of abuse because during and after the investigation, which in fact confirmed the abuse by Frazier and Stillions, the abusive teachers were left in the classrooms or placed in a different classroom. Moreover, the case against Stillions was dismissed and the report omitted from her file, and aides were encouraged not to report abuse, all of which suggests a coverup and concealment of the abuse. The School Board's inaction could plausibly amount to a custom.

As noted, showing a custom attributable to the School Board is not enough; the custom must also be a "moving force" behind the violation. *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). As detailed above, the allegations in this case include many more than one or two isolated prior incidents of abuse. The School Board, through Jackson and Smith, was on notice of multiple

---

the superintendent's knowledge of student abuse was "sufficient at the motion to dismiss stage, because an allegation that a superintendent, board member, or other senior official had knowledge of the alleged misconduct is enough to infer that the district itself had notice."). It is also worth noting, however, that other high-ranking school administration officials—including HR Assistant Superintendent Smith and Principal Vaughan—received notice much earlier.

instances of abuse by Frazier, which were confirmed by February or March of 2016, yet they took no action to implement District-wide corrective policies, supervision, training, or procedures for reporting abuse. Similarly, Principal Vaughan at Kenwood failed to investigate Stillions until the end of April 2016, although she had received three reports of abuse as of March 2016. N.P. was left in the classroom to suffer Stillions's abuse, even after notice of complaints that she had abused N.P. and many other nonverbal students for a period of nearly two years. These allegations support an inference that the School Board's custom of inaction was a moving force behind the continued abuse of N.P.[37] *See Williams*, 181 F. Supp. 3d at 1124 (where complaints of a multi-year pattern of abuse were met with a school district's custom of inaction, the allegations were sufficient to suggest the custom was a moving force behind the later continued abuse).

## 2. ADA and § 504 Claims[38]

N.P. also brings discrimination claims against the School Board pursuant to Title II of the ADA, 42 U.S.C. § 12131, *et seq.*, and Section 504 of the Rehabilitation

---

[37] N.P. concedes that the claim for punitive damages against the School Board must be dismissed.

[38] Discrimination claims under the ADA and the Rehabilitation Act are governed by the same standards, and the two claims are generally discussed together. *See Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000).

Act, 29 U.S.C. § 794 ("§ 504"). [39] The School Board argues that these claims should be dismissed for failure to exhaust administrative remedies under the Individual with Disabilities Act ("IDEA"), 20 U.S.C. § 1400, *et seq*. The Court disagrees.

The IDEA offers federal funds to states in exchange for a commitment to furnish a "free appropriate public education" ("FAPE")[40] to all children with certain physical or intellectual disabilities. *See* 20 U.S.C. § 1412(a)(1)(A). The ADA and § 504, on the other hand, "forbid discrimination on the basis of disability in the provision of public services."[41] *See J.S., III by & through J.S. Jr. v. Houston Cty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017). The IDEA does not "restrict or limit the rights [or] remedies" provided to disabled children by the ADA or § 504. 20 U.S.C. § 1415(l). However, an action brought under the ADA or § 504 is subject to the IDEA's exhaustion requirements if it "seek[s] relief that is also available

---

[39] As an initial matter, the Court strikes N.P.'s request for punitive damages in Counts Eleven and Twelve. *See Barnes v. Gorman*, 536 U.S. 181, 187–88 (2002) (holding that punitive damages may not be awarded in private suits brought under the ADA and the Rehabilitation Act).

[40] A FAPE is comprised of "special education and related services," to include "instruction" tailored to meet a child's "unique needs" and sufficient "supportive services" to permit the child to benefit from that instruction. *See* 20 U.S.C. §§ 1401(9), (26), (29).

[41] The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity," 42 U.S.C. § 12132, while § 504 provides that "[n]o otherwise qualified individual with a disability in the United States, . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," 29 U.S.C. § 794.

under" the IDEA. *Id*. Specifically, an action seeks relief under the IDEA, and exhaustion is therefore required, when the gravamen of the action seeks relief for the denial of a FAPE. *See Fry v. Napoleon Cmty. Sch.,* 137 S. Ct. 743, 748 (2017). To determine whether a claim seeks relief under the IDEA, the Supreme Court has instructed courts to ask a pair of hypothetical questions: "First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school? Second, could an adult at the school have pressed essentially the same grievance?" *Id.* at 756. If the answer to these questions is no, then the complaint likely concerns a FAPE violation under the IDEA. *Id.*

The Supreme Court has specifically noted that a claim involving physical abuse of a disabled student by a teacher, acting out of animus or frustration, "is unlikely to involve the adequacy of special education—and thus is unlikely to require exhaustion." *Id.* at 756 n.9. The gravamen of N.P.'s claims concerns alleged discriminatory and malicious physical abuse of N.P., and other nonverbal, disabled students, not the appropriateness of an educational program.[42] *See id.* (the fact that

---

[42] N.P.'s references to his individualized education program ("IEP"), functional behavior assessment ("FBA"), and behavior intervention plan ("BIP") in his general factual allegations are for context only. The gravamen of his action concerns intentional discrimination and child abuse. *See K.G. by & through Gosch v. Sergeant Bluff-Luton Cmty. Sch. Dist.*, 244 F. Supp. 3d 904, 921 (N.D. Iowa 2017) ("[T]he "gravamen" of the wrongfulness of [the defendant's] conduct in the Complaint's general factual allegations is not that it violated the IDEA, but that it involved unlawful and unreasonable use of physical force against [the plaintiff]. The allegation that the use

"a child could file the same kind of suit against an official at another public facility for inflicting such physical abuse—as could an adult subject to similar treatment by a school official . . . . indicates that the gravamen of the plaintiff's complaint does not concern the appropriateness of an educational program."); *K.G. by & through Gosch v. Sergeant Bluff-Luton Cmty. Sch. Dist.,* 244 F. Supp. 3d 904, 922–23 (N.D. Iowa 2017) (finding that IDEA exhaustion was not required when the plaintiff's claims concerned excessive and unreasonable use of force and discrimination, stemming from the physical abuse of a disabled child, as "the *wrongs* and the *remedies* [were] both beyond the scope of the denial of a FAPE."); *see also P.G. by & through R.G. v. Rutherford Cty. Bd. of Educ.*, 313 F. Supp. 3d 891, 902–06 (M.D. Tenn. 2018) (finding that ADA and § 504 claims concerning physical abuse of a disabled student were not subject to the IDEA's exhaustion requirements).

---

of force was contrary to the IEP and BIP is made as an indication of the *unreasonableness* of the use of force, not as the *gravamen* of the wrongfulness of the conduct.") (emphasis in original); *see also Fry*, 137 S. Ct. at 755 (courts should examine the substance, not surface of an action when assessing whether it is seeks relief under the IDEA); *Lawton v. Success Acad. Charter Sch., Inc.*, 323 F. Supp. 3d 353, 362 (E.D.N.Y. 2018) ("[W]hile plaintiffs' allegations occasionally touch on denial of a FAPE and failure to reasonably accommodate the students, the vast majority of the allegations, and thus the gravamen of the complaint, concern intentional discrimination and retaliation.").

Therefore, N.P.'s ADA and § 504 claims will not be dismissed for failure to exhaust administrative remedies. [43]

### C.    Conspiracy to Interfere with Civil Rights—All Defendants

N.P. also brings claims against all defendants for conspiracy to interfere with his civil rights, pursuant to 42 U.S.C. §§ 1983, 1985(3) (Count Four against the School Board, Count Eight against the named defendants).  As to each conspiracy claim, N.P. alleges that the defendants agreed together to conceal the ongoing abuse for the purpose of cultivating a culture of intimidation that prevented employees

---

[43] Alternatively, the School Board generally argues that N.P. has failed to state a claim because it "is unaware of any Eleventh Circuit case that has recognized the existence of [hostile educational environment] claims under the ADA or Section 504."  ECF No. 20 at 20.  However, the School Board has not cited any binding authority rejecting or declining to recognize a hostile educational environment theory in this context, and in any event, it is not clear whether N.P. is proceeding solely under this theory.  In light of the foregoing and the fact that multiple courts have allowed ADA and § 504 claims premised on similar allegations of discrimination and abuse to go forward, the Court denies the School Board's motion to dismiss on this basis. *See, e.g., Williams*, 181 F. Supp. 3d at 1139, 1139 n.30 (denying motion to dismiss ADA and § 504 claims against school district in light of the alleged physical and verbal abuse of a disabled student by an instructor); *K.G.*, 244 F. Supp. 3d at 928–29 (denying summary judgment as to the plaintiff's ADA and § 504 claims premised on subjecting a disabled student, who was physically abused by teacher, to a hostile educational environment); *K.T. v. Pittsburg Unified Sch. Dist.*, 219 F. Supp. 3d 970 (N.D. Cal. 2016) (finding that a disabled student stated claims under the ADA and § 504 against the school district when she was allegedly abused and the perpetrator of the alleged abuse was deliberately indifferent to her rights); *K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343 (S.D.N.Y. 2005) (finding that a "school district's deliberate indifference to pervasive, severe disability-based harassment that effectively deprive[s] a disabled student of access to the school's resources" is actionable under the ADA); *cf. J.S.*, 877 F.3d at 992 (affirming summary dismissal of ADA and § 504 claims premised on verbal and physical abuse of a disabled student because there were insufficient facts in the record to establish that the defendants were on notice of and deliberately indifferent to the abuse).

from reporting abuse. The defendants move to dismiss, variously arguing that: (1) N.P. has failed to provide any non-conclusory factual allegations of an unlawful agreement to violate his rights; and (2) the intracorporate conspiracy doctrine bars these claims.

### 1.    Failure to State a Claim of Conspiracy

To state a claim for civil conspiracy under § 1983, a plaintiff must allege: (1) a violation of his federal rights under color of state law by at least one state actor; (2) an "understanding" among the defendants to violate those rights; and (3) a resultant "actionable" harm." *See Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1260 (11th Cir. 2010); *Hadley v. Gutierrez*, 526 F.3d 1324, 1332 (11th Cir. 2008) (stating that there must be a causal connection been the conspiracy and the constitutional harm). In contrast, a claim for conspiracy to interfere with civil rights under § 1985(3) requires factual allegations showing: (1) the existence of a conspiracy; (2) for the purpose of depriving a person or class of persons of equal protection under the law; (3) an act in furtherance of the conspiracy; and (4) a resultant injury or deprivation of a constitutional right. *Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001). The primary difference between a § 1985(3) conspiracy claim and its § 1983 counterpart, as relevant to this case at least, is that the second element of a § 1985(3) claim requires proof that a conspirator's action

was motivated by a "class-based, invidiously discriminatory animus'; whereas, there is no such requirement under § 1983.[44] *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). "The linchpin of [any] conspiracy is agreement, which presupposes communication." *Bailey v. Bd. of Cty. Comm'rs of Alachua Cty.*, 956 F.2d 1112, 1122 (11th Cir. 1992). Conclusory allegations of an agreement, without any factual basis to make the allegations plausible, are insufficient to state a conspiracy claim. *Williams*, 181 F. Supp. 3d at 1148. However, an agreement may be inferred "from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct." *Am. Fed'n of Labor and Congress of Indus. Orgs. v. City of Miami, FL*, 637 F.3d 1178, 1192 (11th Cir. 2011).

Applying these principles, the Court first finds that as to several defendants, there is no allegation of fact from which an agreement to violate N.P.'s rights, or to engage in a cover up to violate his rights, could be inferred. Deputy Vasiloff is not alleged to have met or conferred with the administrators, and there is no relationship between him and the other named defendants from which an agreement could be inferred. Nor is there any basis for inferring that his failure to report or to participate in DCF investigations was the result of any such agreement with defendants. N.P.

---

[44] Additionally, § 1983 requires that a defendant have acted under color of state law, while § 1985(3) does not. *See Griffin*, 403 U.S. at 99.

alleges that, "[o]n at least one occasion during the course of DCF investigations, a deputy with the [Sheriff's Office] instructed the parents of a nonverbal ESE student at Silver Sands who had been abused by Frazier, not to pursue prosecution of Frazier," but Vasiloff is not alleged to have instructed anyone not to prosecute. Moreover, the assertion that such an "instruction was part of a longstanding custom, policy, and/or practice within the [Sheriff's Office] and [School District] to conceal the abuse of nonverbal, disabled ESE students, including N.P," ECF No. 135, ¶129, is a mere conclusion. This allegation is too conclusory to state a claim that Vasiloff or anyone from the Sheriff's Office was involved in the alleged conspiracy and cover up.

As to Pickard, she was not the principal until *after* the end of the 2015-16 school year and consequently could not have participated in any conspiracy to violate N.P.'s constitutional rights or cover up complaints that resulted in a violation of his rights. There is no allegation that N.P. was harmed after the end of the 2015-16 school year. For similar reasons, the conspiracy claim fails as to Sommer. It is alleged that she knew of Farley's investigation of Stillions before the end of the school year and generally conspired, but that is all. *See Fullman v. Graddick*, 739 F.2d 553, 556-57 (11th Cir. 1984) (explaining that "conclusory, vague and general" allegations of a conspiracy are insufficient to withstand a motion to dismiss). Any

conspiratorial action by her after the end of the school year could not have caused a violation of N.P.'s constitutional rights, which had already occurred by then, and similarly, any cover up after that time is not alleged to have caused further harm to N.P. Therefore, the motions to dismiss Count Eight will be granted as to Vasiloff, Pickard, and Sommer.

The Court finds that N.P. has stated plausible claims for conspiracy under §§ 1983 and 1985(3) against Jackson, Smith, Vaughan, Farley, and the School Board.[45] The factual allegations, if true, plausibly show that the defendants knew of and communicated with each other about the abuse. Jackson, Smith, and Farley clearly communicated with each other as to Frazier's abuse, allegedly misrepresented the nature and extent of Frazier's misconduct in his disciplinary record, and chose not to meaningfully intervene or stop the abuse, inform the parents that their children were being abused, or fulfill their state-mandated reporting obligations, which, again, is a felony under Florida law. *See* Fla. Stat. § 39.205(1). Likewise, Jackson, Smith, Vaughan, and Farley all aware of Stillions's abuse, chose not to intervene to protect N.P. before the end of the school year, and then acted to dismiss the investigation of Stillions and transfer her to Silver Sands to continue

---

[45] Again, Superintendent Jackson is the executive officer of the School Board and statutorily empowered to act on its behalf. See Fla. Stat. § 1001.33.

working with ESE disabled students. Again, they acted in concert together in not reporting the abuse to DCF or disclosing it to parents. Also, as part of school administration, Jackson, Smith, Vaughan and Farley all had opportunities to communicate together regarding the complaints against Stillions. Investigator Farley, for his part, allegedly "made Kenwood employees agree" not to discuss the Stillions's investigation or their knowledge of her abuse, in an effort to intimidate and further conceal the abuse of ESE children throughout the School District, which violated Florida's mandatory reporting requirements. ECF No. 135, at ¶105. Taken together, these allegations plausibly reflect concerted action by members of a public school administration to conceal the abuse of ESE students and affirmative steps to prevent the public disclosure of the abuse, despite potential criminal liability and thus provide a sufficient factual basis for inferring at this early stage in the proceedings that the School Board, Jackson, Smith, Vaughan, and Farley participated in a conspiracy to cover up the abuse, knowing that N.P. was being abused, for purposes of § 1983, and because of his disability, for purposes of

§ 1985(c).[46]  Also, individual defendants are not entitled to qualified immunity on the conspiracy claim.[47]

## 2.     Intracorporate Conspiracy Doctrine

The School Board, Jackson, and Smith also argue that N.P.'s civil conspiracy claims are barred by the intracorporate conspiracy doctrine.  At this stage, the Court agrees.  As an initial matter, however, the defendants contend that the threadbare and conclusory allegations in the conspiracy counts that they conspired with Vasiloff and "other members" of the Sheriff's Office should be dismissed for purposes of this analysis, and the Court agrees.  Vasiloff has already been dismissed on other grounds, and the Court agrees that allegations that he or any member of the Sheriff's Office participated in the conspiracies are wholly conclusory and unsupported by

---

[46] The Court notes, however, that the inferences drawn on the basis of the allegations at this stage may not be reasonable on a fully developed record.  The proof will need to raise genuine issues of fact regarding how these employees reached an agreement and what they agreed to in order to survive summary judgment.  Also, actions subsequent to the school year, such as not including the Stillions report in Stillions's personnel file and transferring her to Silver Sands, while potentially indicative of intent, could not have resulted in harm to N.P.  Thus, to survive summary judgment, N.P. will have to prove how the alleged conspiracy *caused* N.P.'s injuries after these defendants conspired and before the end of the school year.

[47] The Eleventh Circuit has explicitly held that "public officials cannot raise a qualified immunity defense to a [§] 1985(3) claim."  *See Burrell v. Bd. of Trustees of Ga. Military Coll.*, 970 F.2d 785, 794 (11th Cir. 1992).  Therefore, none of the individual defendants are entitled to qualified immunity on the § 1985(3) claim.  And, taking N.P.'s allegations as true, the defendants are not entitled to qualified immunity on the § 1983 conspiracy claim for the same reasons qualified immunity was denied on the supervisory liability claims—a reasonable school official would have known that the actions alleged violated N.P.'s clearly established rights.

any plausible facts alleged. This leaves only the School Board and members of the administration. While it is true that under the intracorporate conspiracy doctrine, a legal entity—such as the School Board in this case—"cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves," *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000); *see also Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001), the doctrine is not without exceptions. One exception allows proof of a conspiracy in "the rare instance" where corporate employees acted for their own personal purposes rather than those of their employer. *See H & B Equip. Co., Inc. v. Int'l Harvester Co.*, 577 F.2d 239, 244 (5th Cir. 1978).[48] In other words, the doctrine does not bar conspiracy claims where the employees had an "independent personal stake in achieving the object of the conspiracy." *Id.* Several district courts—including two in the Eleventh Circuit—have allowed conspiracy claims involving concealment of school abuse to proceed based on the "independent personal stake exception," where the facts alleged supported a plausible inference that school officials may have covered up reports of abuse in order to protect their own careers. *See, e.g., Williams*, 181 F. Supp. 3d at 1146-48; *Doe 20 v. Bd. of Educ.*

---

[48] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*) (adopting the case law of the former Fifth Circuit before October 1, 1981, as precedent in this Circuit).

*of Cmty. Unit Sch. Dist.* No. 5, 680 F. Supp. 2d 957, 979-81 (C.D. Ill. 2010); *Jordan v. Randolph Cty. Sch.*, No. 4:08cv131, 2009 WL 1410082, at *7 (M.D. Ga. May 19, 2009). Defendants have not identified, and the Court has not found, any school abuse cases finding to the contrary. On consideration, the Court agrees with the district courts that have found it premature to dismiss a conspiracy claim at the pleadings stage based on the intracorporate conspiracy doctrine where, as here, the operative complaint pleads ample facts supporting a plausible inference that school officials actively concealed a teacher's physical abuse of students in furtherance of a conspiracy and in the interest of protecting their reputations and careers. *See id.* Significantly, the individual defendants' failure to report the abuse subjected them to personal criminal liability, which injects another personal stake into the allegations.[49]

### D.    State Law Claims—School Board and Sheriff

N.P. brings state law claims against the School Board and the Sheriff's Office related to the hiring, training, and supervision/retention of Stillions and Vasiloff, respectively, and seeks to hold the entities vicariously liable under the theory of

---

[49] The Court again emphasizes the preliminary nature of this finding. To survive summary judgment, N.P. must show the individual defendants' personal interests were "wholly separable from" the interests of the School Board. *See Selman v. Am. Sports Underwriters, Inc.*, 697 F. Supp. 225, 239 (W.D. Va. 1988).

*respondeat superior*.  The School Board and Sheriff each move to dismiss the

negligent hiring, training, supervision/retention claims for failure to state a claim and

on sovereign immunity grounds (Counts Fourteen and Fifteen), and the School

Board moves to dismiss the *respondeat superior* claim on sovereign immunity

grounds (Count Sixteen).[50]  The Court agrees with the defendants in part.  As an

initial matter, the Court dismisses the negligent hiring claims summarily.[51]  Despite

N.P.'s assertion otherwise, there is no allegation of fact that could support a plausible

negligent hiring claim regarding either Stillions or Vasiloff.

### 1.    Negligent Supervision/Retention

The School Board argues that N.P. has failed to state a claim of negligent

retention, and the Sheriff argues that N.P. has failed to state a claim for negligent

supervision.[52]  Under Florida law, "[n]egligent retention occurs when, during the

---

[50] N.P. also alleged a claim for violation of the rights of a developmentally disabled person under Fla. Stat. § 393.13 (Count Thirteen), as well as claims for punitive damages and prejudgment interest against the School Board and the Sheriff.  However, he now wishes to dismiss and/or strike these claims.  *See* ECF No. 144, at 2; ECF No. 136, at 8. That request is **GRANTED**.

[51] N.P. argues that the complaint sufficiently states a claim for negligent hiring of Stillions against the School Board but cites no paragraph alleging any supporting facts that an investigation into Stillions's background would have revealed her unsuitability for employment, and the Court has found none.  *See Malicki v. Doe*, 814 So. 2d 347, 362 (Fla. 2002) (elements of negligent hiring claim).  Similarly, no facts suggest a plausible claim against the Sheriff's Office for negligent hiring of Vasiloff, and N.P. failed even to respond to the Sheriff's motion on this ground.  Thus, the negligent hiring claim against the Sheriff is abandoned and will be dismissed.

[52] The claims of negligent supervision and negligent retention are generally discussed together.  *See e.g., Int'l Sec. Mgmt. Grp., Inc. v. Rolland,* 271 So. 3d 33, 49 (Fla. 3d DCA 2018)

course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further actions such as investigating, discharge, or reassignment." *Fernandez v. Bal Harbour Vill.*, 49 F. Supp. 3d 1144, 1153 (S.D. Fla. 2014). "The factors constituting notice, employee fitness, . . . the type of action reasonably required of the employer[,]" and "the negligence of an employer's acts or omissions" are questions of fact that will "vary with the circumstances of each case." *Garcia v. Duffy*, 492 So. 2d 435, 442 (Fla. 2d DCA 1986). To survive a motion to dismiss, a plaintiff must plead sufficient facts to establish that the employer owed and breached a duty to the injured person, which caused the injury. *See id.* at 439; *see also Roberson v. Duval Cty. Sch. Bd.*, 618 So. 2d 360, 362 (1st DCA 1993).

Applying these principles, the Court finds that N.P. has adequately alleged a claim against the School Board for negligent retention of Stillions. To begin with, it is beyond dispute that the School Board had a "common law duty to protect [students] from the result of negligent hiring, supervision, or retention" of employees

---

(noting, "Liability for negligent supervision or retention . . . occurs after employment begins, where the employer knows or should know of an employee's unfitness and fails to take further action such as investigating, discharge or reassignment." (internal quotations omitted)). Here, the claims are based on the same factual basis, and therefore, the negligent supervision claim is subsumed in the negligent retention analysis and will not be analyzed separately.

"whose negligent or intentional acts . . . [could] foreseeably cause injuries to students." *See Sch. Bd. of Orange Cty. v. Coffey*, 524 So. 2d 1052, 1053 (Fla. 5th DCA 1988) (school board had duty to protect student from negligent supervision and retention of school teacher who sexually abused student); *see also Wyke v. Polk Cty. Sch. Bd.*, 129 F.3d 560, 571 (11th Cir. 1997) (citing *Rupp v. Bryant*, 417 So. 2d 658, 666 (Fla. 1982)) ("Florida schools have a duty to supervise students placed within their care."). N.P alleges that the School Board breached its duty when it received numerous reports that Stillions was physically abusing ESE students and failed to protect him. It is sufficiently alleged, as detailed above, that the School Board had at least constructive notice through Jackson, Smith, and Vaughan of Stillions's physically abusive conduct. Thus, it is plausible that the School Board knew or should have known of her unfitness for the job before the end of the 2015-16 school year but took no action to remove her from the classroom, resulting in continued abuse. Whether the School Board responded reasonably after it had notice is a question of fact, and thus, this claim will not be dismissed against the School Board.

The Sheriff argues that N.P.'s assertion that he knew or should have known of Vasiloff's conduct is conclusory. The Court agrees. As the Supreme Court has explained, even under notice pleading, which permits general allegations of

knowledge and does not require a heightened pleading standard, this rule "does not give him license to evade the less rigid—though still operative—strictures of Rule 8." *Iqbal*, 556 U.S. at 686–87. Although the Sheriff disciplined Vasiloff in June 2017 for neglecting his duties at Kenwood, N.P. does not plausibly raise an inference that the Sheriff was on notice of Vasiloff's failure to investigate with DCF or of Vasiloff's general unfitness during the 2015-16 school year. Statements that the Sheriff was "on notice" or "had knowledge" are alone insufficient. *See Watts v. City of Hollywood, Fla.*, 146 F. Supp. 3d 1254, 1269 (S.D. Fla. 2015) ("As with any other claim asserted in federal court, conclusory allegations do not suffice to satisfy the notice element of a negligent supervision claim; specific facts must be alleged."). Equally insufficient are the conclusory allegations that Stillions's and Frazier's conduct was "rampant" and was "reported to" Sheriff's Office "employees" (¶¶68, 69, 83). These allegations do not implicate Vasiloff. In any event, his misconduct alone (¶¶118-119) does not establish notice to the Sheriff in the absence of a plausible allegation that a school administrator or employee or DCF investigator made a complaint to the Sheriff about Vasiloff during the 2015-16 school year.[53]

---

[53] Also, complaints to or contacts between parents and Sheriff's Office employees regarding Frazier's conduct at Silver Sands do not plausibly raise an inference that the Sheriff should have known of the unfitness of Vasiloff, who was stationed at Kenwood, not Silver Sands.

The plausible allegations suggest, to the contrary, that school administrators and the investigator were acting to *conceal* the abuse and thus failed to make any mandatory reports. Thus, the negligent supervision/retention claims against the Sheriff will be dismissed for failure to state a claim.

## 2. Sovereign Immunity

The School Board asserts that sovereign immunity bars N.H.'s common law claims for negligent training and *respondeat superior*.[54] Under Florida law, agencies and subdivisions of the state are generally immune from tort liability, except to the extent that immunity is expressly waived "by legislative enactment or constitutional amendment." *See Ingraham v. Dade Cty. Sch. Bd.*, 450 So. 2d 847, 848 (Fla. 1984) (citing Fla. Const., art. X, § 13 and Fla. Stat. § 768.28). In this case, then, the applicability of sovereign immunity turns on whether the State of Florida has waived that immunity for claims alleged by N.P.

In the context of a negligence claim, Florida courts have held that sovereign immunity extends to "discretionary" governmental functions, but not to acts that are "operational in nature." *See Kaisner v. Kolb*, 543 So. 2d 732, 736 (Fla. 1989). A

---

[54] Although the School Board does not argue otherwise, the Court notes that the negligent "retention and supervision of a teacher by a school board are not acts covered with sovereign immunity" under Florida law. *See Sch. Bd. of Orange Cty. v. Coffey*, 524 So. 2d 1052, 1053 (Fla. 5th DCA 1988); *see also Brantly v. Dade Cty. Sch. Bd.*, 493 So. 2d 471, 472 (Fla. 3d DCA 1986).

"discretionary function" is one in which "the governmental act in question involved an exercise of executive or legislative power such that, for the court to intervene by way of tort law, it inappropriately would entangle itself in fundamental questions of policy and planning." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1117-18 (11th Cir. 2005) (citing *Henderson v. Bowden*, 737 So. 2d 532, 538 (Fla. 1999)).  In contrast, an operational function is one not inherent in policy or planning but merely reflects a secondary decision as to how those policies or plans will be implemented.  *See id*. at 1118.  Distinguishing between the boundary of discretionary policy-making and operational choices generally is a highly fact-dependent exercise. *See Commercial Carrier Corp. v. Indian River Cty.*, 371 So. 2d 1010, 1020 (Fla. 1979) (laying out four-part factual test).

### a.    Negligent Training

In the context of a negligence claim, Florida courts have held that sovereign immunity extends to "discretionary" governmental functions, but not to acts that are "operational in nature." *See Kaisner v. Kolb*, 543 So. 2d 732, 736 (Fla. 1989).  A "discretionary function" is one in which "the governmental act in question involved an exercise of executive or legislative power such that, for the court to intervene by way of tort law, it inappropriately would entangle itself in fundamental questions of policy and planning." *Cook*, 402 F.3d at 1117-18 (citing *Henderson*, 737 So. 2d  at

538).  In contrast, an operational function is one not inherent in policy or planning but merely reflects a secondary decision as to how those policies or plans will be implemented.  *See id.* at 1118.  Distinguishing between the boundary of discretionary policy-making and operational choices generally is a highly fact-dependent exercise.  *See Commercial Carrier Corp. v. Indian River Cty.*, 371 So. 2d 1010, 1020 (Fla. 1979) (laying out four-part factual test).

In this case, N.P. alleges that the School Board was negligent by failing to "adequately and appropriately train employees in identifying, documenting, and/or reporting child abuse," ECF No. 135, ¶¶275, which includes the alleged failure to properly implement and enforce training on state-mandated reporting obligations.  N.P. maintains that these were operational choices to which sovereign immunity does not apply.  The Court agrees, in part.

Claims for negligent training are typically barred by sovereign immunity because a "decision regarding how to train . . . [employees] and what subject matter to include in the training is clearly an exercise of governmental discretion regarding fundamental questions of policy and planning."  *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1266 (11th Cir. 2001); *see also Cook*, 402 F.3d at 1118.  Nevertheless, negligent training claims premised on "the implementation or operation of [a] training program, as opposed to the program's content, may involve operational

functions," depending on the facts of the case. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005).

Applying these principles here, to the extent N.P.'s negligent training claim challenges the content of the School Board's training policies and procedures, it is directed at a discretionary governmental function and, therefore, barred by sovereign immunity. To the extent N.P. is challenging the School Board's alleged operational negligence in the implementation of its training policies and procedures, he has stated a plausible claim for relief. The Court finds that the complaint appears to be directed at the alleged failure to implement or conduct training. However, the Court emphasizes the preliminary nature of this finding. After the parties have developed a factual record during discovery, the Court will be better positioned to evaluate whether sovereign immunity applies to N.P.'s negligent training claim. For now, he has carried his initial burden of alleging facts sufficient to support a cause of action.

Not so as to the Sheriff. Again, only conclusory allegations are aimed at the Sheriff. It is merely alleged that Vasiloff knew of abuse, failed to investigate or report it, and therefore the Sheriff must have inadequately trained him. "The negligent training cause of action is not this broad." *Watts,* 146 F. Supp. 3d at 1269 (noting it is not sufficient to merely allege an employee did something wrong so there must have been inadequate training; "instead, [plaintiff] must identify a

CASE NO. 3:18cv453-MCR-HTC

training program or policy and explain specifically how the City was negligent in implementing it"); *Gelbard*, 845 F. Supp. 2d at 1341 (complaint must allege "specific training or [a] subject matter that Defendant failed to provide to its police force," and it was not sufficient that the complaint relied only on "legal conclusions that are couched as factual").

### b. *Respondeat Superior*

N.P. alternatively claims that the School Board is vicariously liable for the allegedly negligent actions of its employee, Stillions, under a theory of *respondeat superior*. Under Florida's doctrine of *respondent superior*, a local government is liable in tort for the actions or omissions of an employee committed within the scope of his or her employment, but it is shielded from liability if the employee "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a).[55] A local government may even be held liable for an intentional tort, such as excessive force or battery, "as long as the employee was acting in the course and scope of his

---

[55] In addition, the statute provides that the "exclusive remedy" for an act or omission of a local government employee is an action against the governmental entity, "unless such act or omission was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a); *id.* § 768.28(2) (for purposes of this section, the terms "state agencies and subdivisions" include counties and municipalities).

employment" and not with "bad faith, malicious purpose, or wanton and willful disregard of the plaintiff's rights." *Gregory v. Miami-Dade Cty., Fla*., 719 F. App'x 859, 873 (11th Cir. 2017) (quoting *City of Boynton Beach v. Weiss*, 120 So. 3d 606, 611 (Fla. 4th DCA 2013)).

The School Board argues that the *respondeat superior* claim should be dismissed because under the facts pled, Stillions's conduct can only be viewed as bad faith, malicious, and in wanton disregard of human rights, precluding liability for the School Board. N.P. responds that federal notice pleading requirements permit him to plead in the alternative.

Federal Rule of Civil Procedure 8(d) "expressly permits the pleading of both alternative and inconsistent claims." *United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1273 (11th Cir. 2009); *see also Brookhaven Landscape & Grading Co. v. J.F. Barton Contracting Co*., 676 F.2d 516, 523 (11th Cir. 1982) ("Litigants in federal court may pursue alternative theories of recovery, regardless of their consistency."). In this context, however, if the facts alleged "can occur only from bad faith or malicious or wanton and willful conduct, then the claim against the government entity fails" on sovereign immunity grounds. *Gregory*, 719 F. App'x at 873.

While it is difficult to conceive of any portion of Stillions's conduct as negligent on the facts alleged, cases illustrate that a "disciplinary tactic" that

CASE NO. 3:18cv453-MCR-HTC

amounts to intentional battery may not always rise to the level of being malicious or wanton. *Compare Carestio v. Sch. Bd. of Broward Cty.*, 866 So. 2d 754 (Fla. 4th DCA 2004) (allowing jury to decide whether school employees who kicked and punched a student for disruptive behavior were within the scope of employment or acting in a willful and wanton manner) *with Gregory*, 719 F. App'x at 873 (dismissing where a 16-year-old was shot six times in the back, finding the conduct "much more reprehensible and unacceptable than mere intentional conduct"). Therefore, the Court agrees with N.P. that, at this stage, notice pleading allows the *respondeat superior* claim to go forward.

In sum, claims remaining in this suit are the following: Substantive Due Process and Equal Protection claims against the School Board (Counts Two and Three) and Jackson, Smith, and Vaughan (Counts Five, Six, and Seven); the conspiracy claims against the School Board (Count Four) and Jackson, Smith, Vaughan, and Farley (Count Eight); the ADA and Rehabilitation Act claims against the School Board (Counts Eleven and Twelve); claims of negligent supervision/retention and negligent training against the School Board (Count Fourteen), and *respondeat superior* (Count Sixteen) against the School Board; as well as claims that were not challenged by the Sheriff (*respondeat superior*) or by Stillions, who filed an Answer.

CASE NO. 3:18cv453-MCR-HTC

Accordingly:

A.  The Okaloosa County School Board's motion to dismiss, ECF No. 112, is **GRANTED IN PART** and **DENIED IN PART**, as follows:

    1.  The motion is **GRANTED** with respect to:

        a.  Count One (Fourth Amendment) and Count Thirteen (Fla. Stat. § 393.13), which are **DISMISSED** in their entirety.

        b.  The negligent hiring claim alleged in Count Fourteen, which is **DISMISSED**.

        c.  The punitive damages claims against the School Board, as well as the state law claims for prejudgment interest, and the reference to the Florida Constitution in Count Three, of which are **STRICKEN**.

    2.  The motion is **DENIED** with respect to Count Two (substantive due process), Count Three (equal protection), Count Four (civil conspiracy), Count Eleven (ADA), Count Twelve (Rehabilitation Act) and Count Sixteen (*respondeat superior*), as well as the negligent training, retention, and supervision claims alleged in Count Fourteen, which remain pending against the School Board.

B.  The motion to dismiss of Larry Ashley, in his Official Capacity as Sheriff of Okaloosa County, Florida, ECF No. 107, is **GRANTED** as follows:

    1.  Count Fifteen (negligent hiring, training, supervision and/or retention) is **DISMISSED** in its entirety, and the requests for punitive damages and prejudgment interest against the Sheriff are stricken.

2. Count Seventeen remains pending against the Sheriff.

C. Mary Beth Jackson's motion to dismiss, ECF No. 111, is **DENIED.**

D. Stacie Smith's motion to dismiss, ECF No. 90, is **GRANTED IN PART** and **DENIED IN PART**, as follows:

    1. The motion is **GRANTED** with respect the Florida Constitution claim, which is **STRIKCEN** from Count Eight as to **all Defendants**.

    2. The motion is **DENIED** in all other respects.

E. Angelyn Vaughan's motion to dismiss, ECF No. 88, is **DENIED**.

F. Arden Farley's motion to dismiss, ECF No. 89, is **GRANTED IN PART** and **DENIED IN PART**, as follows:

    1. The motion is **GRANTED** with respect to Count Five, Count Six, and Count Seven, which are **DISMISSED** as against Farley.

    2. The motion is **DENIED** with respect to Count Eight (civil conspiracy), which remains pending against Farley.

G. The motions to dismiss filed by Joan Pickard, Dwayne Vasiloff, and Melody Sommer, ECF Nos. 96, 109, and 114, are **GRANTED**. Defendants Joan Pickard, Dwayne Vasiloff, and Melody Sommer, are **DISMISSED**, but the Court is NOT directing the entry of judgment until judgment is entered as to all defendants. *See* Fed. R. Civ. P. 54(b).

H. The previously imposed stay of discovery is hereby **LIFTED**.

CASE NO. 3:18cv453-MCR-HTC

I.      By separate order, the Court will schedule a status conference to discuss the progression of this litigation going forward.


**DONE AND ORDERED** this 30th day of September 2019.


*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**